UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN KYLE WILLIAMS,

                    Petitioner,

                                        Case Number 14-13008
v.                                      Honorable David M. Lawson

THOMAS MACKIE,

                    Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

An aborted marijuana transaction ended with Sherrell Hunter taking a bullet in her forehead, which she survived. Petitioner Justin Williams was one the two possible assailants on the other side of the transaction. The other was not apprehended. Williams contended that the other guy did it, but he was convicted at a bench trial of assault with intent to murder and sentenced to 12 to 50 years in prison. He challenges that conviction in a petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Warden Thomas Mackie argues that the petition should be denied because some of Williams's claims were not preserved properly in the state court and others lack merit. Because none of Williams's claims are meritorious, the Court will deny the petition.

## I.

Williams was tried in the Wayne County, Michigan circuit court. Sherrell Hunter testified that, on the afternoon of October 31, 2010, she contacted three or four people in an effort to sell two pounds of marijuana at $1,100 per pound. The marijuana belonged to Crystal Johnson, but Hunter was the "middleman." Williams expressed an interest in buying the marijuana and told Hunter to meet him on Westminster Street. Johnson and Hunter's friend Yvette then drove Hunter to Westminster Street where they saw Williams walking with another man. Hunter got out of the

-1-

car and asked Williams to point out the house where they were going. Hunter then went back to the car, grabbed a blue Walmart bag containing the marijuana, and followed Williams and his companion into the corner of an abandoned house on Westminster. Hunter acknowledged that she had no reason to be afraid of the petitioner on the day in question because she had engaged in dozens of drug deals with him in the past.

Once inside the house, Hunter handed Williams the bag of marijuana to inspect. He was standing in front of her at the time, and the other man was standing a few inches behind her to her left. Williams looked at the marijuana, and when he turned as if he were going to walk away with it, Hunter grabbed the bag. Williams did not put up a struggle. Instead, he let go of the bag and said, "Hold up." Williams then walked into another room. When he returned, Hunter did not see anything in his hand, and she did not see his hands or arms move, but she did hear the gunshot and then blacked out. She tried to get up, but she fell back down and called Yvette on her phone and said, "They shot me." She did not mention Williams by name as the shooter.

Hunter testified that she was looking at Williams's face and not his hands or arm movements when he approached her in the house on Westminster. She also stated that the other man did not move from his position behind her and that he never came around to face her. She was shot above her left eyebrow.

Hunter spent eighteen days in the hospital. She did not want to speak with the police at first because she wanted to resolve the matter herself. She did tell her mother what happened. It was not until 40 days later that Hunter told the police about the incident. Then, she gave a description of Williams to police officer Raytheon Martin and identified Williams in a photo array.

Officer Raytheon Martin testified that he went to see Hunter in the hospital after the shooting. Hunter was somewhat medicated and did not want to talk, so, he left his business card

with Hunter's mother. At a later time, he spoke with both Hunter and her mother, and on December 9, 2010, he showed Hunter a photo array. Hunter identified Williams.

Williams was arrested on January 11, 2011 for an unrelated offense and was then interviewed by Sergeant Terrence Sims of the Detroit Police Department. When Sergeant Sims asked Williams about the shooting at 506 Westminster, Williams said,

> Around 3:00 P.M. in the afternoon I received a call from Sherrell Hunter. And she says she was on the block. And she asked me where I was. I told her at the store. We met on Westminster. I asked her if she wanted to do it right here or go somewhere.

Trial Tr. at 214, ECF No. 8-2, PageID.447. The interview continued:

> Question [by Sergeant Sims]: What did you mean by do it right here?

> Answer [by the petitioner]: She was going to sell me one pound of marijuana for eleven hundred dollars. I had the money with me at that time. Also this guy named Train (phonetic) was with us. He was suppose[d] to buy a pound also.

> Question: What happened next?

> Answer: We went to the house. And Sherrell grabbed two pounds of marihuana out the trunk of a white Buick that one of her friends was driving. We went inside the house. I looked at the weed and went and got my scale. Then I told Train I need your money. He said let me make sure the door is closed. I heard the door close. Then I heard one gunshot. Then I heard Sherrell['s] body drop. I was in the kitchen and she was in the living room with Train. After the gunshot I ran out the back door. I haven't seen Sherrell or Train since.

> Question: Did you shoot Sherrell?

> Answer: No. Train shot Sherrell.

> Question: Describe Train.

> Answer: He's a black male, 24, 5'9", 150 pounds, brown complected, moustache, braids, no glasses. He was wearing blue clothing at the time. I've known him for about a year. He's normally on Oakland and Westminster.

> Question: The gun that you were caught with today was that the gun used in this shooting?

Answer: No.

Question: Why would Sherrell say you shot her?

Answer: Because she didn't know Train. She only knew me. She only knows me.

*Id*. at 214-16, PageID.447-49. Sergeant Sims stated that, although he did try to determine who Train was, he did not have Train's real name, date of birth, or phone number.

Detective Lieutenant Brett Sojda, a firearms and tool-mark examiner for the Michigan State Police, testified that the firearm attributed to Williams could not have fired the bullet recovered from the victim.

Yulonda Webb, a defense witness, was the paramedic who responded to the crime scene. She observed Hunter lying on the floor of the vacant house at 506 Westminster Street. Hunter was injured but capable of communicating, and she refused to say who shot her.

Kimberly Williams, the petitioner's aunt testified that she and other family members attended the petitioner's preliminary examination on January 26, 2011. She observed the female prosecutor and a man lean over the railing in the courtroom and talk to Hunter. The prosecutor asked Hunter whether she was sure it was the petitioner who shot her, and Hunter responded that she did not know and was not sure it was him. The prosecutor then told Hunter that she had to be sure it was him.

Kenisha Reid, who had a child with Williams, also testified that she saw a lady and a man approach Hunter at the preliminary examination. According to Reid,

> the lady asked [the victim] is [sic] you sure that she's the one who shot you. And she kept saying she didn't know, she didn't know. And the lady was like, well, we can't go to trial off of you not knowing. And she was like, well, yes — well, she used the street name Rock. She says, yeah, Rock was the one who shot her.

Trial Tr. at 30, ECF No. 8-3, PageID.485. Reid explained that what Hunter said had upset her because Hunter was trying to take Reid's daughter from her father, despite not knowing for sure whether he was the one who shot her.

Williams had been charged with assault with intent to commit murder, assault with intent to do great bodily harm less than murder, and possession of a firearm during the commission of a felony (felony firearm). After hearing the testimony, the court sitting without a jury found Williams guilty of assault with intent to commit murder. The trial court opined that Williams and his accomplice

> robbed [the victim]. They were putting her down so she wouldn't move again.
> . . . .
> [S]he was set up. They were robbing her. It's an aiding and abetting situation. And she had to go down. She had to. There was no way that he could get away with this unless she was dead.

Trial Tr. at 104, ECF No. 8-3, PageID.599. The court acquitted Williams of felony-firearm because the court did not know who shot Hunter. The court also acquitted him of assault with intent to do great bodily harm less than murder because the court considered that count to be an alternative count to assault with intent to commit murder.

Williams filed a direct appeal, arguing that the evidence was insufficient to support his conviction, the verdict was against the great weight of the evidence, and he was entitled to re-sentencing on properly scored guidelines. The Michigan Court of Appeals affirmed, *People v. Williams*, No. 305934, 2012 WL 6913780 (Mich. Ct. App. Nov. 20, 2012), and the state supreme court denied leave to appeal, *People v. Williams*, 493 Mich. 969, 829 N.W.2d 231 (2013).

In May 2014, Williams filed a motion for relief from judgment in which he argued that the trial court was biased, he was denied a fair trial by the admission of "bad acts" evidence, and his trial and appellate attorneys were ineffective. Before receiving a decision on that motion, he

commenced this action for a writ of habeas corpus raising all the claims he raised in state court, even the claims asserted in his yet-undecided post-conviction motion, but he asked the Court to hold his petition in abeyance while he continued to pursue state remedies. The Court granted that request, and after the state courts denied Williams any relief on his post-conviction and ensuing appeals, *see People v. Williams*, No. 327138 (Mich. Ct. App. July 24, 2015); *People v. Williams*, 499 Mich. 927, 878 N.W.2d 862 (2016), the stay was lifted and the warden filed a response.

The warden filed an answer to the petition arguing that some of Williams's claims are subject to the defense of procedural default. The "procedural default" argument is a reference to the rule that the petitioner did not preserve properly some of his claims in state court, and the state court's ruling on that basis is an adequate and independent ground for the denial of relief. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Court finds it unnecessary to address this procedural question. It is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The procedural defense will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)). The AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

The claims Williams raised in his post-conviction motion were not decided by the state appellate courts with reasoned opinions; instead they were rendered in summary orders. Nonetheless, the deference required by the AEDPA still must be afforded. "Under [*Harrington v. Richter*], '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of

any indication or state-law procedural principles to the contrary.'" *Barton v. Warden S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 99).

A.

Williams first argues that there was insufficient evidence to support his conviction on an aiding and abetting theory. He maintains that the state courts speculated that he planned the crime and lured Hunter to the Westminster location to rob and shoot her, but there was no evidence of a common plan or that he knew the assailant intended to harm the victim or do anything illegal, except purchase marijuana. Williams also contends that the state courts ignored Hunter's testimony about her relationship with him, and even though there was evidence from Yvette Wright that he fled from the scene, the trial court found Wright to be unreliable.

The Michigan Court of Appeals disagreed. It reasoned,

> Hunter could not testify with regard to who actually shot her because she never saw the gun. However, even though defendant may or may not have in fact pulled the trigger, there is no doubt that defendant lured Hunter into a vacant house, stood in front of one doorway while Train stood in front of another doorway, and with Train stole $2,200 worth of marijuana from Hunter. There is also no doubt that either defendant shot Hunter in the head or defendant stood by while Train shot Hunter in the head, at close range and with no warning. The evidence also established that defendant and Train left Hunter for dead, lying on the floor of a vacant house bleeding from the head, while they ran out of the back of the house with the bag of marijuana and fled the scene together. These circumstances do not suggest a man who was "merely present" but, rather, one who both planned and actively participated in the scheme to lure Hunter to a vacant house, isolate her, take the marijuana, shoot her to cover their tracks, and then flee.

*Williams*, 2012 WL 6913780, at *2. Based on those factual inferences, the court held, "the record evidence would allow a rational trier of fact to conclude beyond a reasonable doubt that defendant committed an act or encouraged Train in a manner that assisted Train in assaulting the victim with intent to murder." *Ibid.* (footnote omitted).

After reviewing the record, it is difficult to conclude that the state courts misapplied federal law governing this issue. Certainly, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). And on direct appeal, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). That rubric "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Jackson*, 443 U.S. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). The Sixth Circuit reads those cases as creating a gauntlet for state prisoners asserting a sufficiency-of-evidence challenge under the AEDPA: they must penetrate "two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Under Michigan law, a conviction of assault with intent to commit murder requires proof of an assault made when the perpetrator harbored the actual intent to kill under circumstances that, if successful, would have made the killing murder. *People v. Brown*, 267 Mich. App. 141, 147–48, 703 N.W.2d 230, 236 (2005) (citations and footnote omitted). The court of appeals found sufficient evidence of an actual intent to kill because "a gun was used to commit the assault against Hunter, an instrument naturally adapted to produce death." *Williams*, 2012 WL 6913780, at *2 (quotation marks and footnote omitted). And, of course, Hunter was shot in the head.

To convict on an aiding and abetting theory, the state must offer proof that the crime was committed by someone — either the defendant or an accomplice — that the defendant either

committed acts or gave encouragement "that assisted the commission of the crime," and that the defendant intended that the crime be committed "or knew that the principal intended its commission at the time he gave aid and encouragement." *People v. Henderson*, 306 Mich. App. 1, 10, 854 N.W.2d 234, 246 (2014) (citation omitted).

The state courts properly applied the *Jackson* rule when evaluating the sufficiency of the evidence. Despite Hunter's inability to say who shot her, she did say that it was Williams who approached her after he went into another room and then she heard what she described as "pow." She was shot in the face, and she testified that the other man was behind her at the time and did not walk around her to face her. A rational trier of fact could have inferred from this evidence that Williams went to another room to retrieve a gun or to pull a gun from his clothing and then returned to where Hunter was waiting and shot her. Alternatively, a rational trier of fact could have inferred that Williams aided and abetted Train in shooting Hunter. It was plain that a drug heist was planned. And there was evidence that after the shot was fired, Williams grabbed the bag of marijuana and fled out the back door.

Williams argues that the evidence of flight should be disregarded, because it came from Yvette Wright, whom the trial court found to be unreliable. But there was other evidence of flight, namely, Williams's statement to Sergeant Sims that he ran out the back door of the house after the shooting and had not seen Hunter or Train since then. Moreover, a federal habeas court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326).

Because the state court reasonably determined that there was sufficient evidence to convince a factfinder of Williams's guilt beyond a reasonable doubt of all the elements of the crime according to state law, Williams is not entitled to a writ of habeas corpus on this claim.

B.

Williams raised a related claim in the Michigan Court of Appeals — that his conviction is against the great weight of the evidence — and he raises it again here. That court rejected Williams's argument that there was no evidence of a common plan between him and Train, other than to buy marijuana. That argument has no traction here, because it is a claim grounded in state law, and a federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002); *see also Artis v. Collins*, 14 F. App'x 387 (6th Cir. 2001) (declining to grant certificate of appealability to habeas petitioner on claim that jury's verdict was against the manifest weight of the evidence).

C.

Next, Williams repeats his argument made to the court of appeals that he is entitled to resentencing because the trial court incorrectly scored several offense variables when calculating his sentencing guidelines. Claims that arise out of a state trial court's sentencing decision are not cognizable upon federal habeas review unless the petitioner can show that the sentence exceeded the statutory limits or is wholly unauthorized by law. *Lucey v. Lavigne*, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001); *see Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state

concern only."); *see also Cheatham v. Hosey*, 12 F.3d 211, 1993 WL 478854, *2 (6th Cir. Nov. 19, 1993) (departure from state sentencing guidelines is a state law issue, which is not cognizable on federal habeas review). Williams's sentence is within the statutory maximum for assault with intent to commit murder. *See* Mich. Comp. Laws §§ 750.83. A sentence imposed within the statutory limits is generally not subject to federal habeas review. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999).

A defendant is entitled to be sentenced on the basis of accurate information. A sentence violates due process of law if the trial court relied on extensively and materially false information, which the defendant had no opportunity to correct through counsel. *See Townsend,* 334 U.S. at 741 (holding that a sentence based on "assumptions concerning [defendant's] criminal record which were materially untrue" violated due process). But to obtain relief, a petitioner must show that his sentence was "founded at least in part upon misinformation of constitutional magnitude." *United States v. Tucker,* 404 U.S. 443, 447 (1972).

Williams's arguments challenging the offense variable scoring are not at all based on the information considered by the trial court, but instead he takes issue with the court's application of those variables to the facts found at trial. Williams has not identified any inaccurate information that might bring his claim within the scope of a federal constitutional violation. He is not entitled to relief.

### D.

In his fourth claim, Williams argues that his trial attorney was ineffective by failing to impeach Hunter with her prior inconsistent statement to the police and by failing to call expert witnesses specializing in brain trauma and psychology.

A violation of the Sixth Amendment right to the effective assistance of counsel is established when an attorney's performance was deficient, and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Williams first presented these claims to the state courts in a post-conviction motion filed after his direct appeal. The state appellate courts summarily denied relief. But the Court presumes the claims were decided on the merits, applying federal law. *Barton*, 786 F.3d at 460 (quoting *Harrington*, 562 U.S. at 99).

The rejection of any contention based on deficient cross-examination is easily reconciled with federal law. Williams says that trial counsel should have impeached Hunter with her prior inconsistent statement to the police. In that prior statement, Hunter said that Williams pulled out a gun and shot her. At trial, she asserted repeatedly that she did not see anything in Williams's hand immediately before the shooting. It is plain to see that Hunter's prior statement to the police was far more damaging to the defense than Hunter's trial testimony. One could readily conclude, therefore, that defense counsel wisely avoided asking Hunter about her statement to the police.

To his credit, defense counsel attempted to impeach Hunter in other ways. He elicited testimony from her that she had no problems with Williams during her previous dealings with him, that she had no reason to fear him before the shooting, and that he had never threatened her. Defense counsel also elicited Hunter's testimony that Williams did not run away or struggle with her over the bag of marijuana when she grabbed it from him as he turned to walk away. Significantly, defense counsel elicited Hunter's concession that she did not see anything in Williams's hand at the time of the shooting, that she would have seen a gun if he had one, that she would have seen him raise his arm if that happened, and that she could see counsel raise his hand in the courtroom even though she did not see the petitioner make the same gesture on the day of the shooting. Hunter also admitted in response to defense counsel's questions that she did not tell anyone who shot her until approximately forty days after the shooting.

Defense counsel's cross-examination and re-cross examination of Hunter cover about fifty pages of transcript, and in the words of the state trial court, counsel "was very effective in impeaching [Hunter]." *People v. Williams*, No. 11-1680-01, Op. and Order, p.2 (Wayne Cty. Cir. Ct. Nov. 7, 2014). His decisions about the areas to probe and the questions to ask were reasonable strategic decisions.

-14-

Williams also argues that trial counsel was ineffective because he did not call expert witnesses on brain trauma and psychology. According to Williams, expert witnesses could have shed light on Hunter's state of mind and shown that she pressed charges against him because she was hurt and angry, but did not know the shooter's real name. Williams contends that expert witnesses also may have been able to show how Hunter's head injury affected her memory.

Although "[i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, . . . that formulation is sufficiently general that state courts would have wide latitude in applying it." *Harrington*, 562 U.S. at 106. "There are . . . 'countless ways to provide effective assistance in any given case'"; "[r]are are the situations in which the 'wide latitude counsel must have in making tactical decisions'" will be limited to any one technique or approach." *Id*. (quoting *Strickland*, 466 U.S. at 689).

In this case, Hunter testified intelligently and clearly about details of the crime. Although she did not recall some details, her lapse of memory may have benefitted the petitioner's defense.

Furthermore, defense counsel raised some of the same issues that Williams argues an expert witness could have addressed, and the trial judge, who was the fact-finder in the case, stated on post-conviction review that an expert witness on brain trauma or psychology was unnecessary. The trial judge also stated that the testimony would not have been outcome determinative because a rational trier of fact still could have concluded that Williams committed an act or assisted Train in assaulting Hunter with an intent to kill.

The manner of cross-examination and the choices of expert witness to call are matters of trial strategy. Federal habeas courts do not second-guess judgments of that sort. That is one reason why the standard for obtaining habeas corpus relief on ineffective-assistance-of-counsel claims under *Strickland* is "'difficult to meet.'" *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting

*Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Ibid.*

Williams has not convincingly made that argument; he has not shown deficient performance. The state courts' decisions faithfully applied federal law.

E.

Williams also repeats an argument made in his post-conviction motion that the trial judge was biased against him and made degrading remarks about defense counsel. He says his lawyer should have moved to disqualify the judge. The trial court rejected that argument.

The Due Process Clause of the Fourteenth Amendment guarantees a fair trial in a fair tribunal before a judge who has no actual bias against the defendant or interest in the outcome of the case. *See Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997). But to prevail on his judicial-bias claim, Williams must show "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964). The Supreme Court has made clear that

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an

extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States,* 510 U.S. 540, 555 (1994) (emphases in original).

Williams bases his claims of bias on (1) the trial judge's reference to former United States Representative Gabrielle Gifford, who was shot in the head before Williams's trial, (2) the trial court's ruling that Williams's statement to the police was admissible and that the parties could take up the matter with the court of appeals, and (3) the trial judge's statement that she was keeping her voice down because "they say I'm so rude to people."

The trial judge did express impatience at times during the two-day trial, but she spread her annoyance around, directing it not only to defense counsel, but also to the prosecutor and even a prosecution witness. At times, she sustained the prosecutor's objections, but at other times, she ruled in defense counsel's favor. Her "expressions of impatience, dissatisfaction, annoyance, and even anger, . . . are within the bounds of what imperfect men and women . . . sometimes display"; they do not establish bias or partiality. *Liteky*, 510 U.S. at 555-56.

The disputed reference to Representative Gifford reads:

It was quite obvious to me from hearing [Hunter's] testimony and knowing where the wound was, whoever shot her in the forehead intended to kill her. They did not expect that she was young enough and apparently protected by a higher authority, like Miss Gifford, who took a gunshot wound to the head, and is still walking around and talking. They didn't expect that to happen, because that's not what's suppose[d] to happen.

Trial Tr. at 99, ECF No. 8-3, PageID.554. The trial judge made these comments when she rendered her judgment. She explained in her subsequent written decision on Williams's motion for relief from judgment that she was not personally acquainted with Ms. Gifford and that her reference to Ms. Gifford was meant to point out that gunshots to the head are usually fatal. *See People v.*

*Williams*, No. 11-1680-01, Op. and Order, p. 2 (Wayne Cty. Cir. Ct. Nov. 7, 2014). That was a logical observation, and it is not indicative of bias or partiality.

The trial judge's comment that she was keeping her voice down because people thought she was rude also was not indicative of any bias toward defense counsel or toward Williams. The judge was not accusing defense counsel of saying she was loud or rude. It appears instead that she meant to say other people had criticized her in the past for being loud and rude.

Finally, there is no merit in Williams's contention that the trial judge's admission of his statement to the police was a reflection of the trial judge's bias or partiality. Adverse judicial rulings do not establish bias or prejudice sufficient to disqualify a judge. *Liteky*, 510 U.S. at 555; *Hence v. Smith*, 49 F. Supp. 2d 547, 549 (E.D. Mich. 1999).

The record does not reveal any deep-seated (or even superficial) antagonism or bias on the part of the trial judge. Trial counsel was not ineffective by not attempting to disqualify the trial judge.

## F.

Next, Williams argues that he was denied due process and a fair trial when the trial court admitted "bad acts" evidence. The disputed evidence appears to be a portion of Williams's statement to the police where he discussed his arrest for carrying or possessing a gun on January 11, 2011. He argues that the evidence was used to inflame the trial court's passion and to gain a conviction regardless of its prejudicial impact. Alternatively, he contends that trial counsel was ineffective by failing to move to suppress his statement.

An alleged violation of the state evidence rule that prohibits admission of certain "other acts" evidence is not cognizable on habeas review. "[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in

the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Admission of evidence that a defendant committed a criminal act other than the charged offenses is not fundamentally unfair, particularly when it is not offered to prove the defendant's general bad character or propensity to commit the charged crime.

Evidence that Williams possessed a gun in January 2011 may have been damaging to him if the factfinder — the court — inferred that he also carried a firearm on the day of the shooting. But there is no indication that the trial judge drew that inference. And even if she had, the Supreme Court has declined to hold that similar other-acts evidence is so extremely unfair that its admission violates fundamental conceptions of justice, *Dowling v. United States*, 493 U.S. 342, 352–53 (1990), although it has found "no question that propensity would be an 'improper basis' for conviction," *Old Chief v. United States,* 519 U.S. 172, 182 (1997). Such matters are more appropriately addressed in codes of evidence and procedure than under the Due Process Clause. *Id.* at 352. Put more directly, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003); *see also* Fed. R. Evid. 413 and 414 (allowing such evidence in federal criminal trials involving sexual misconduct).

And defense counsel cannot be faulted for the way he dealt with that evidence. Defense counsel argued that the portion of the statement covering the January 11, 2011 incident was irrelevant and inadmissible. Initially, the trial court ruled that the entire statement was admissible, but after defense counsel continued to object to the admission of the "other acts" evidence, the prosecutor agreed to delete the objectionable portion of the statement.

Sergeant Sims, nevertheless, read into the record the portion of the statement where he asked the petitioner if the gun that the petitioner "was caught with" on January 11, 2011 was the gun used in the shooting of Hunter on October 31, 2010. The petitioner answered, "No."

Williams asserts that his lawyer should have moved to suppress his statement to the police, not because it was involuntary, but because it contained an admission about another gun possession. That statement, however, was mostly exculpatory and laid out Williams's defense. Moreover, defense counsel already had secured an agreement with the prosecutor to refrain from offering the part of the statement referring to a previous gun possession. Defense counsel explained at trial that he did not know the prosecutor was going to use that part of Williams's statement and was taken by surprise. He was entitled to rely on the prosecutor's assurance that the contested information would not be admitted in evidence. No defective performance can be found there.

G.

Finally, Williams argues that his appellate lawyer was ineffective because he did not raise the arguments Williams advanced in his post-conviction motion.

The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, the petitioner ordinarily must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal. *Strickland*, 466 U.S. at 687. However, it is well established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).

This Court has already determined that Williams's tag-along claims lack merit. "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ). Because none of these claims can be shown to be meritorious, appellate counsel was not ineffective in his handling of Williams's direct appeal. Williams is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

### III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d). The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: July 16, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on July 16, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI

---